AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

United States Courts
Southern District of Texas
F I L E D

FEB 25 2020

David J. Bradley, Clerk of Court

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

9811 Martha Springs Drive, Houston, TX 77070

)
)
)
)
)
)

Case No.  **H20-0400M**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A to Affidavit

located in the _____ Southern _____ District of _____ Texas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B to Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 666 | Theft of Federal Funds |
| 18 U.S.C. 371 | Conspiracy |
| 18 U.S.C. 1349 | Wire Fraud |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

IRS-CI Special Agent Jason Webb
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2-25-20

*Judge's signature*

City and state: Houston, Texas

Nancy K. Johnson, United States Magistrate Judge
*Printed name and title*

United States Courts
Southern District of Texas
F I L E D

FEB 25 2020

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In the Matter of the Search of:

9811 Martha Springs Drive
Houston, Texas 77070,
which consists of a tan, stucco, two story
residence located in the Vintage Lakes
Subdivision.

Hattie Mae White Building, 4400 West 18th
Street, Room 3SE32, Houston, Texas 77092,
which consists of an office suite in a multi-
story office building.

H20-0399M

H20-0400M

Case No. _____

**Filed Under Seal**

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jason Webb, being first duly sworn, hereby depose and state as follows:

### AFFIANT'S BACKGROUND

1.     I am a Special Agent with the Internal Revenue Service – Criminal Investigation
(IRS-CI), and have been since September 2009.  My responsibilities include the investigation of
possible criminal violations of the Internal Revenue laws under Title 26 of the United States
Code and related offenses, particularly as found in Title 18 and Title 31 of the United States
Code.

2.     I have received formal training in conducting criminal tax investigations, money
laundering investigations, currency crimes and other related offenses.  In my capacity as a
Special Agent, I have conducted investigations of a variety of tax and related financial offenses.
Through my training and experience, I have become familiar with the types of records businesses
typically maintain in the course of their regular activity including ledgers, journals, invoices,

receipts, and bank documents.  A large part of my duties as an IRS-CI Special Agent has

involved analyzing these types of records to determine the existence of criminal activity and to

develop evidence of criminal activity.  In addition, I am a Certified Public Accountant (CPA),

licensed in the State of Texas.

## PROPERTY SOUGHT TO BE SEARCHED

3.      I make this affidavit in support of an application for a search warrant to search the

following premises:

     a.   9811 Martha Springs, Houston, Texas 77070;

     b.   Hattie Mae White Building, 4400 West 18th Street, Room 3SE32, Houston, Texas

       77092 (collectively, the search "PREMISES").

4.      Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that Brian Busby, Anthony Hutchison, and others have

committed violations of 18 U.S.C. § 666 (Theft of Federal Funds), 18 U.S.C. § 1343 (Wire

Fraud), 18 U.S.C. § 1346 (Honest Services Fraud), and 18 U.S.C. § 1349 (Conspiracy).

5.      The properties to be searched are Brian Busby's residence and office, which are

described more fully in Attachment A.  The items to be seized from Busby's residence and office

are described more fully in Attachment B.

## PROBABLE CAUSE

6.      The United States Attorney's Office for the Southern District of Texas, the

Federal Bureau of Investigation, the Department of Education, and the Internal Revenue Service,

Criminal Investigation, are investigating Brian G. Busby, Anthony L. Hutchison, and others for possible violations of 18 U.S.C. § 666 (Theft of Federal Funds), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1346 (Honest Services Fraud), and 18 U.S.C. § 1349 (Conspiracy).

7.      In December 2016, Brian G. Busby was appointed to the position of Chief Operating Officer (COO) of the Houston Independent School District (HISD) by the former Superintendent Richard Carranza.  Busby's office is located in the Hattie Mae White Building at 4400 West 18th Street, Room 3SE32, Houston, Texas 77092, and he resides at 9811 Martha Springs Drive, Houston, TX 77070.  According to HISD's website, www.houstonisd.org, Busby started working for HISD in the late 1990s as a custodian and advanced within the ranks.  As COO, Busby is responsible for over 7,000 employees and oversees an annual operating budget of over $250 million.  Based on HISD annual financial statements for the year ending 06/30/2017, HISD received approximately $185 million in federal funds for that year.

8.      During Busby's rise through HISD, witnesses have stated to the FBI that they believe Busby has engaged in kickback schemes with multiple HISD vendors.  Two of the vendors whom witnesses identified as paying Busby kickbacks are Southwest Wholesale Nursery, which later changed its name to Southwest Wholesale, LLC ("Southwest Wholesale") and Just Construction Incorporated, which later changed its name to Just Partners Construction ("Just Construction").  Southwest Wholesale is a lawn service and landscaping company.  Just Construction is a construction company.  Anthony Hutchison owns both companies, and both companies conduct business with HISD.

9.      Starting in 2010, Southwest Wholesale has provided limited gardening and landscaping services to HISD.  On 01/15/2016, HISD awarded Southwest Wholesale contract

3

number 15-08-43 for grounds maintenance, landscaping, tree pruning and removal, and irrigation systems for specific schools within HISD.  HISD Contract 15-08-43 was valued at approximately $26.8 million and is expected to be extended to January 2021.

10.    The investigation has revealed that there is probable cause to believe that Southwest Wholesale and Hutchison are involved in an illegal kickback scheme with Busby. Records in the government's possession show that Southwest Wholesale, with Busby's help, defrauded HISD, a state academic institution that is partially federally funded, by submitting invoices for contracted work that was not performed.  Busby and his colleagues instructed HISD's grounds maintenance employees to perform the work that had been contracted to Southwest Wholesale, in effect supplying Southwest Wholesale with HISD labor.  Meanwhile, Busby, through his direct reports, directed his managers to authorize and approve overtime pay to incentivize HISD grounds maintenance employees to perform the work.  Busby also exhibits unusual affluence, the likely source of which is kickbacks from Southwest Wholesale.

A.    **Southwest Wholesale Submits Invoices for Work Not Performed**

11.    The first example of Southwest Wholesale not performing contracted work involves renovation of HISD athletic fields.  In March 2018, documents provided by Marmion Dambrino, at the time the HISD Athletic Director, indicate that on 04/12/2018 Southwest Wholesale submitted a proposal via hutchison@swat4241.com to Alisha Jolivette[1], Officer of Facilities and Services, and Busby for the renovation of Sharpstown Middle School (also known as Sharpstown International) playing fields at a contract price of $984,600.00.  Through a series

---

[1] Officer of Facilities and Services reports directly under Chief Operations Officer, Brian Busby.

4

of emails, Busby and Jolivette approved the proposal, despite Dambrino's written concerns about the high price. The original Southwest Wholesale proposal included renovation of the playing field and the installation of 55 65-gallon trees with 110 tree stakes and five cubic yards of mulch. It also included installing two trashcans mounted in a cement base, and it included supplying and installing two soccer goals. It also called for removing all vegetation growth inside of the track and repairing asphalt, "Marking & Striping," and installing "approximately 6' x 370' sq. ft. of Pedestrian sidewalk to access 3 angle cement steps recessed in slope to Soccer Field (Handicap ramp included)."

12.     According to an email chain that Dambrino provided to the FBI, Busby agreed to the Southwest Wholesale proposal. However, Dambrino discovered that the above-listed items were not performed. On 8/13/2018, after the contract completion due date of 06/01/2018, Dambrino made the following observations: the agreed proposal charged $69,080.00 for laying concrete for a sidewalk that included a handicap ramp. However, there was no ramp installed. The agreed proposal charged $9,800.00 for "Marking & Striping," but Dambrino did not observe any marking or striping on the field. The agreed proposal charged $85,900.00 for "Asphalt and Track," and further stated vegetation growth inside the track was to be removed and the asphalt repaired. Dambrino observed none of these things were done. The agreed proposal charged $48,150.00 to install 55 65-gallon trees, 110 tree stakes, and five cubic yards of mulch. Dambrino observed no new trees were planted. The agreed proposal referenced two trashcans mounted in cement bases, but Dambrino did not find any cement-mounted trash cans[2].

---

[2] Per HISD Policy, vendors are paid after the job is represented by the vendor to be completed and HISD personnel verify completion.

13.     After the first agreed proposal for $984,600.00 in construction/renovation was paid in full, HISD entered a second agreement with Southwest Wholesale to provide an additional $194,420.10 in construction on the same playing fields, which HISD also paid in full. Dambrino obtained a copy of an invoice from Southwest Wholesale dated 06/07/2018.  The invoice number 2018-600784 makes clear that HISD is paying for some of the same things that were listed in the first agreed proposal, including "Repair approximately 6' x 370' sq. ft. of Pedestrian sidewalk to access 3 angle cement steps recessed in slope to Soccer Field (Handicap ramp included)," "Provide 3 Trash Cans mounted in cement base," and set up and install 5 row Aluminum Bleachers on each side of the field.

14.     Dambrino noted the new concrete pad was poured, in accordance with the original agreed proposal, but no new bleachers were added.  The invoice charged $15,000.00 for set-up and installation of "Aluminum Bleachers each side of field," but according to Dambrino the pre-existing bleachers were still present.  As with the first proposal, the invoice charged for concrete mounted trashcans that were not installed.  Southwest Wholesale has therefore charged HISD twice for the same work that still has not been performed.  Lastly, the invoice charged $69,080.00 for laying concrete for a sidewalk, which includes a handicap ramp.  Dambrino observed no handicap ramp, which is another duplicate charge like the trashcans.

15.     On 9/25/2019, the Court approved a search warrant on hutchison@swat4241.com which revealed Southwest Wholesale Invoices 2018-600784 and 2018-600787 for $194,420.10 and $980,600.00, respectively, which were identical to what was proposed in the contract.  These invoices were paid in full by HISD check numbers 1689024 and 1692692, which correspond to HISD Purchase Orders 8000268296 and 8000269248, respectively.  Additionally, from the

6

search warrant, 223 photographs likely taken by an affiliate of Southwest Wholesale show progress and completion of the work associated with Purchase Order 8000269248[3].  Of the 223 photographs, there was no photograph that shows installation of concrete mounted trashcans, planting of trees, or installation of two soccer goals and bleachers.  The photographs did depict construction crews working around the existing soccer goals rather than supplying and installing two new soccer goals as indicated in the contract.

16.     On 01/02/2020, FBI Surveillance of Sharpstown Middle School's playing fields did not observe any handicap ramps, concrete mounted trashcans, or bleachers on each side of the field, as were called for in the contract.

**B.          Brian Busby Supplies Southwest Wholesale With HISD's Labor**

17.     The evidence shows that Busby, through his subordinates, supplies HISD labor to Southwest Wholesale in order to assist with or complete work Southwest Wholesale has contracted to perform.  Much of the HISD labor that was supplied to Southwest Wholesale is performed and paid as overtime, at a huge cost to HISD.

18.     Witness #1, who has been an HISD employee for approximately 20 years, reported that on multiple occasions Larry Nabors, HISD Senior Manager of Grounds and Pest Control, who ultimately reports to Busby, directed the HISD grounds crew to mow school lawns that Southwest Wholesale was responsible for mowing but not to report that the jobs were completed by an HISD grounds crew.   Witness #1 reported HISD is responsible for mowing the

---

[3] Purchase Order 8000269248 is associated with Southwest Wholesale Invoice 2018-600787, in the amount of $980,600.00.

lawn for approximately 65 schools on the east and southeast sides of Houston. The HISD grounds crew would start mowing lawns at 5 a.m., and after finishing at least two schools, they were given the option to stay and work overtime in order to mow school grounds that Southwest Wholesale had contracted to mow and had been paid to mow. Witness #1 recalled that the HISD grounds crew mowed the lawns of multiple schools Southwest Wholesale had contracted to mow. On one occasion, a crew from Southwest Wholesale arrived at a school while the HISD grounds crew was already mowing the lawn. Southwest Wholesale employees finished what little was left of the work and had their receipt signed by the school office, verifying that they had cut the grass. (It is standard practice at HISD, and an HISD policy, to have someone in the school's front office validate that lawn maintenance occurred.)

19.     According to Witness #1, Nabors verbally told the HISD grounds crew team leads which schools contracted by Southwest Wholesale needed to be mowed, and, in turn, the team leads directed the grounds crew. On one occasion, a team lead documented the lawn maintenance completed by HISD in an Excel Spreadsheet, which he provided to Nabors. However, Nabors asked the team lead to remove a school from the list that had been contracted to Southwest Wholesale. According to Witness #1, Nabors deliberately avoided documenting the occasions that HISD mowed schools for Southwest Wholesale.

20.     Witness #1 noted two of Nabors's direct reports, Kelvin Scurry and Jeffrey Spiller, received a significant amount of overtime pay. According to Robert Robinson, Former HISD Payroll Manager, an overtime audit from December 2017 to August 2018 revealed that Spiller mowed grass from 4 a.m. all the way into the evenings and made more than $100,000 annually—essentially doubling his salary due to excessive overtime.

8

21.     Multiple witnesses confirm that Nabors, who is ultimately supervised by Busby, is very close with Busby personally.  Witness #1 believes Busby knew the nature of the overtime pay for Kelvin Scurry and Jeffrey Spiller and the work they did in place of Southwest Wholesale, which is why overtime pay was authorized.  Robinson believes the overtime payments were part of a larger kickback scheme.  Robinson points out that HISD contracts much of its landscaping and mowing work to private vendors, and questions why Spiller would need to be paid large amounts of overtime when HISD had paid a contractor to perform the work.  According to Robinson, this arrangement makes no sense.

## C.     Southwest Wholesale Routinely Overbills HISD for Mowing

22.     Records show that Southwest Wholesale routinely overbills HISD for the work it performs under its mowing contract.  Invoice records in the government's possession reveal that Southwest Wholesale billed HISD for four cuts for each of the 157 HISD schools in June 2018.  Included in the 157 schools for which Southwest Wholesale billed and received payment were Rhoads Elementary School, Bastian Elementary School, Worthing High School, Port of Houston Elementary School, and Young Elementary School.  However, Witness #1 reported that in 2018 HISD employees handled the mowing at each of these schools.  In short, based on Southwest Wholesale's 6/25/2018 invoice, Southwest Wholesale improperly charged and received payment from HISD for the following:

| Quantity | Campus Name | Acreage | Unit Cost | Total |
|----------|-------------|---------|-----------|-------|
| 4 | Rhoads ES | 7.7 | $35.80 | $1,102.64 |
| 4 | Worthing HS | 20.11 | $35.80 | $2,879.75 |
| 4 | Young ES | 4.38 | $35.80 | $627.22 |

9

| 4 | Bastian ES | 5.43 | $35.80 | $777.58 |
| 4 | Port of Houston ES | 4.29 | $35.80 | $614.33 |

**D.**       **Busby Exhibits Unusual Affluence**

23.       The evidence shows that Busby exhibits an unusual level of affluence for his position. Records in the government's possession reveal Busby has signatory control over multiple bank accounts with Navy Federal Credit Union (NFCU), JP Morgan Chase Bank (JPMCB), Allegiance Bank, and Wells Fargo Bank (WFB). Busby is a W-2 wage earner employed by HISD. He receives recurring biweekly electronic deposits from HISD in the amount of approximately $5,700.00, with an annual salary of $221,000.00. Courtney Busby, Busby's wife, is a W-2 wage earner employed by HISD. She receives recurring biweekly electronic deposits from HISD in the approximate amount of $3,300.00, with an annual salary of $140,760.00.

24.       On 03/15/2012, Busby and Courtney Busby established a Wells Fargo Advantage Business Package checking account for Kashmere Gardens Early Learning Academy account ending in 7370. Kashmere Gardens Early Learning Academy is a child daycare center owned by the Busbys. A review of deposits made to the account identified the sum of deposits as follows:

| Kashmere Gardens Early Learning Academy account ending in 7370 | | | |
|---|---|---|---|
| Year  2015 | 2016 | 2017 | 2018 |
| $68,057 | $76,081 | $64,985 | $62,592 |

25.       Of the deposits noted above, the Government identified cash deposited into the Kashmere Gardens account in 2016 totaling $52,280.00, of which several large deposits appear

to be structured.  Specifically, $22,000.00 was deposited in cash within a one week time period

from 01/28/2016 to 02/05/2016 in multiple deposits of less than $10,000 (which is the currency

transaction-reporting threshold).  Other additional large deposits occurred sporadically in 2016.

Another large deposit of $8,000.00 occurred on 09/12/2017.

    26.    Busby has five rental properties.  Summarized below are Busby's Forms 1040 US

Individual Income Tax Return Schedule E Supplemental Income and Loss reports for his rental

properties, showing total income from 2015 through 2017 to be $159,231.00 as follows:

| Physical Address | 2015 Income | 2016 Income | 2017 Income |
|---|---|---|---|
| 7729 St Lo, Houston, TX | $10,200.00 | $11,400.00 | $11,400.00 |
| 7733 St Lo, Houston, TX | $11,300.00 | $11,400.00 | $13,200.00 |
| 12514 Donegal Way, Houston, TX | $0 | $1,400.00 | $16,800.00 |
| 10303 Gena Ct. Houston, TX | $12,000.00 | $12,000.00 | $19,800.00 |
| 4914 Airport Blvd Houston, TX | $0 | $9,900.00 | $14,400.00 |
| Total | $35,515.00 | $48,116.00 | $75,600.00 |

Financial records in the government's possession revealed most of the deposits made for rent

were cash deposits.

    27.    On 12/26/2018, Busby and Courtney Busby opened a business account with Navy

Federal Credit Union under BCMRV INVESTMENTS, LLC, and Employer Identification

Number 83-2053383.  The business application describes it as, "Real Estate: purchase and rent

real estate with estimated cash in the amount of $15,000.00 per month or more and checks in the

amount of $3,500."  Based on investigation and IRS analysis of Busby's federal income tax

11

returns, the highest recorded gross from rental properties was $75,600.00 in 2017.  By opening the business account with the anticipation of $15,000.00 in cash deposited per month, or $180,000.00 per year, Busby could be attempting to legitimize his unexplained income stream as part of his rental income.

28.    Analysis of bank accounts controlled by Busby and his nominees revealed from calendar year 2015 through 2019, Busby made approximately $2,330,315 in cash deposits to the below-mentioned accounts that did not stem from HISD salaries:

| Account Ending | Bank | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| 7362 | WFB - Busby Construction | $127,750 | $32,730 | $323,641 | $300,000 | $139,300 |
| 7370 | WFB- Kashmere Gardens | $24,032 | $52,280 | $14,920 | $8,295 | $17,634 |
| 9958 | WFB - Victoria Luddington | | $3,000 | | | |
| 2804 | NFCU - Courtney Busby (savings) | | | | $53,000 | |
| 9727 | WFB - Brian / Courtney Busby | $139,684 | $256,105 | $101,656 | $7,500 | |
| 9279 | WFB - Brian / Courtney Busby | | $580 | | 0 | |
| 0130 | NFCU - Brian / Courtney Busby | | | $5,500 | $149,000 | $74,900 |
| 4592 | NFCU - Brian Busby | | | | $135,185 | $184,550 |
| 6748 | WFB - Busby Construction | | | $11,800 | 0 | |
| 8801 | NFCU | | $400 | $5,300 | 0 | |
| 4313 | NFCU | | | | $93,300 | $18,000 |
| 6179 | NFCU – Brian / Courtney Busby | | | | $82.50 | $4,973 |
| 6731 | NFCU – BCMRV Investments LLC | | | | 0 | $33,425 |
| 6005 | NFCU  - Regan | | | | $82 | $11,843 |

12

| | Busby | | | | | |
|---|---|---|---|---|---|---|
| **Total** | | $291,466 | $345,095 | $462,817 | $746,445 | $484,625 |

29.    On 09/25/2018, an FBI surveillance team observed Busby visiting Hutchison's residence.  Busby remained at the residence for more than an hour.  Over the next week after meeting with Hutchison, Busby deposited a total of $21,000.00 in cash into two bank accounts. Specifically, on 09/26/2018, Busby made a cash deposit of $9,000.00 into Wells Fargo account ending 7362.  On 09/27/2018, he deposited an additional $3,000.00 in cash into the same account.  On 10/01/2018, Busby made two separate deposits within hours of each other, totaling $9,000.00 into Navy Federal Credit Union account ending 4592.

30.    On 01/14/2019, Busby was observed by an FBI surveillance team meeting with Davitka Hamler, owner of Facilities Integrated Solutions and Consulting, at a Navy Federal Credit Union branch.  Investigation determined Hamler conducts financial transactions on behalf of Hutchison and his companies Southwest Wholesale and Just Construction.  Specifically, financial records show Hamler used email address accounting@swat4241.com to conduct some financial transactions.  Additionally, telephone records in the government's possession revealed that Hamler is in telephonic contact with both Busby and Hutchison.  On the same day Busby met with Hamler, he made an $8,100.00 cash deposit into the account ending 6005 in the name of Brian Busby and Reagan Nicole Busby (his daughter) at the same Navy Federal Credit Union. Busby also made three separate $9,500.00 structured cash deposits into the Wells Fargo account

ending 7362, one of which was on 01/14/2019, while two others were days after Busby met with Hamler[4].

**E.      Evidence from the Search of Hutchison-Related Email Accounts Confirms the Scheme to Systematically Overbill HISD**

31.      On 09/25/2019, the Court approved a search warrant for email addresses hutchison@swat4241.com, bbusby7729@gmail.com, chicago.buffalo32@gmail.com, and admin@swat4241.com.  The FBI has reviewed the communications obtained from that search. The review produced additional evidence of the criminal scheme and of the locations of Southwest Wholesale, Just Construction, and AL&H Customs Homes where business is conducted and records are stored.

32.      Documents obtained from the email search show that Busby received financial benefits from Hutchison.  Email records from the search of hutchison@swat4241.com reveal that in November 2014 to January 2015, Hutchison, doing business as AL&H Customs Homes, provided extensive renovation and decoration to Busby's residence at 9811 Martha Springs Drive, Houston, Texas.  Analysis of records from the email search show that AL&H Custom Homes invoiced Southwest Wholesale to pay for the third-party invoices and decorative supplies that were used in Busby's home.  The records indicate Hutchison/Southwest Wholesale paid approximately $83,000.00 for the benefit of Busby.  Records in the government's possession show that on 03/11/2019, Busby made one unspecified payment of $44,000.00 to AL&H

---

[4] Several deposits that appear to be structured are noted above.  Financial records show multiple large deposits occurring in various accounts of Busby's from 2015 to 2018, all falling below the $10,000.00 threshold.

Customs Homes.  The government possesses no other records that show Busby made any additional payments to Hutchison or Southwest Wholesale for this work.

33.     Records also show that from 2015 to August 2019, Southwest Wholesale provided lawn care service to Kashmere Gardens Early Learning Academy, located at 4313 Cavalcade Street, Houston, Texas.  The frequency of the lawn care service appears to match that in the Frequency Chart described below.  This child daycare center is owned by the Busbys. Southwest Wholesale codes this location as "Calvacade" or "Calvacade Childcare Center[5]" on its mowing tracking spreadsheet.  On a separate billing tracking spreadsheet, Southwest Wholesale notes in the comments section as "Included in HISD Contract," but pays its sub-contractor $25.00 per cut.  The government possesses no records that show Busby made any payments to Hutchison, Southwest Wholesale, AL&H Customs Homes, or Just Construction for this work.

34.     The searched email communications also show that Hutchison/Southwest Wholesale systematically overbill HISD for the mowing that Southwest Wholesale performs. Available records show that from July 2013 to August 2019, Southwest Wholesale used a Frequency Chart to instruct its sub-contractors regarding Southwest Wholesale's mowing requirements.  Southwest Wholesale incorporates the Frequency Chart, also known as Addendum I, in its contracts with sub-contractors.  The Frequency Chart remained unchanged at least up to the date the email search warrant was executed.  The "Frequency Chart" is set forth below:

_____

[5] Misspelling of "Cavalcade" in the original document.

Frequency Chart

| DESCRIPTION | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEPT | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fencelines | | | | | | AS NEEDED | | | | | | | |
| Mowing | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 2 | 1 | 1 | 1 | 20 |
| Edging | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 2 | 1 | 1 | 1 | 20 |
| Weedwacking | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 2 | 1 | 1 | 1 | 20 |
| Blowing | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 2 | 1 | 1 | 1 | 20 |
| Pick-Up Trash | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 2 | 1 | 1 | 1 | 20 |
| Shrub Trimming | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 7 |
| Tree Pruning (Ornamental) | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Tree Pruning (Large/Small) | | | | | | 7' CLEARANCE AS NEEDED | | | | | | | |
| Tree Sucker Removal | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 7 |
| Flower Bed Weed Removal | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 7 |
| Policing (pick up job related debri) | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 7 |
| Sidewalks/Paving Clean-up | 1 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 7 |
| Reporting to HISD Manager | THIS WILL BE DONE WEEKLY AND SUBMISSION OF DAILY REPORTS IS REQUIRED | | | | | | | | | | | | |

| | |
|---|---|
| Aeration | ADDITIONAL SERVICES |
| Special Events | ADDITIONAL SERVICES |
| Landscape Design and Architecture | ADDITIONAL SERVICES |
| Fire Ant Control | ADDITIONAL SERVICES |
| Landscape Renovations | ADDITIONAL SERVICES |
| Irrigation Services | ADDITIONAL SERVICES |
| Digital Imaging Before & After Projec | ADDITIONAL SERVICES |
| Damaged Areas and Repairs | ADDITIONAL SERVICES |
| Mulch Trees | ADDITIONAL SERVICES |
| Mulch Flower Beds | ADDITIONAL SERVICES |
| Irrigation Repairs | ADDITIONAL SERVICES |
| Erosion Control | ADDITIONAL SERVICES |

35.     In an email communication dated 03/07/2013, Hutchison provides a new mowing schedule to his sub-contractors.  In the email, Hutchison states, "Also, please schedule each school to be cut within 10 to 15 days to its last service.  Please do not exceed 15 days in between cuts.  For example, if a property is cut on February 25th its next cut should be scheduled 10 to 15 days after which would be any day on or between March 7th and March 12th.  Example two, if a property is cut on February 28th and its next cut is scheduled for March 8th this would be only 8 days later which is too soon.  Instead schedule the second cut on or between March 10th and March 15th."

36.     In another email communication dated 07/23/2013, Ivory Ogunmakin, Executive Administrator for Southwest Wholesale, using hutchison@swat4241.com, amended the Frequency Chart for the month of August.  In the email, Ivory states,

"Good Afternoon, Per HISD request, there will be only two (2) cuts performed for August 2013. As a result, Addendum I (Frequency Chart) of the Contractor Agreement will be amended for the month of August. The changes are as follows:

| | |
|---|---|
| Fencelines | As Needed |
| Mowing | 2 |
| Edging | 2 |
| Weedwacking | 2 |
| Blowing | 2 |
| Pick-Up Trash | 2 |

All other values on Addendum I (Frequency Chart) will remain the same. Please be reminded that your August 2013 Mowing Schedule is due by 5pm on July 25, 2013.

Feel free to respond by email with any questions or concerns. (Verbal conversations with Supervisors will not serve as binding agreements.)

Thank you,
Ivory Ogunmakin
Executive Administrator
Southwest Wholesale"

37.     Two months later, on 09/24/2013, hutchison@swat4241.com sent an email to various sub-contractors.  The email contains a letter from Anthony Hutchison that states:

"To:  Contractors

From:  Southwest Wholesale

Ref:  Monthly Cuts for October

Date:  9/24/2013

To all contractors,

Per Anthony Hutchison, for the month of October, the frequency will be changed from one cut monthly to two cuts per month.  Please add additional cut to October Schedule, to increase to two cuts per month for the month of October. All October Schedule need to

be sent into the office by 9/25/2013.  Schedules need to be sent in immediately so that approvals can be made. Please be mindful of additional cuts so that your schedule reflects two cuts per month.


Thank You,

Anthony Hutchison"

38.     Another email communication dated 09/28/2018 is from admin@swat4241.com and forwarded by Tameka Hall-Harris, Field Supervisor for Southwest Wholesale, to various sub-contractors.  The email states:

"Good morning,

Mr. Hutchison has requested for the month of October, you will be making TWO cuts for each contracted property instead of one; as outlined on the frequency chart. We are requesting that updated schedules be provided to us that will reflect these changes. If you have already submitted your October cut schedules with two cuts, please disregard this email. If you have not submitted your schedule with both and second dates, that are within the 12-14 day contractual requirement, please provide that information to us by Sunday, September 30, 2018. Adding these second cuts to this month's schedule will allow us the opportunity to provide our clients the services we are best known for; attention to detail, quality and great customer service. Please note that we have received confirmation that the FIRST week's scheduled cuts for October have been approved and the remainder of the month's cut will be approved once all dates are confirmed to fall within contractual guidelines."

39.     Other emails and records in government's possession show Southwest Wholesale kept monthly mowing schedule spreadsheets, which contain a color-coded breakdown of Southwest Wholesale sub-contractors and their mowing activity for all of their contracted properties.  The email search also revealed Southwest Wholesale keeps both hard and soft copies of monthly mowing schedules, subcontractor's mowing proposals and payments, and subcontractor's contracts.  These records support the conclusion that Southwest Wholesale and its sub-contractors follow the Frequency Chart's prescribed 20 cuts per year, including

modifications made to the Chart in July and September 2013, to subtract one cut in August and add one cut in October.

40.    Records obtained from the email search and other records show that Southwest Wholesale's lawn maintenance invoices and purchase orders for HISD properties generally match the proposed level of work but not to the actual work performed.  From approximately March 2013 to December 2016, Southwest Wholesale invoiced HISD for 36 cuts per HISD property per year, and from approximately January 2017 to August 2019, for 35 cuts per property per year for approximately 122 HISD properties.  This scheme of billing an extra 15-16 cuts per year is achieved by billing for four cuts between the months of March to September when only two cuts occurred, and two cuts in February when only one cut occurred.   From March 2013 to December 2016, records show that Southwest Wholesale billed HISD for four cuts in October, which is contrary to its mowing tracking records, which show two cuts in October.  HISD has paid all of these mowing invoices in full.

41.    Based on the reviewed records, Southwest Wholesale has overbilled HISD approximately $80,000.00 per month for eight months per year, which totals to approximately $640,000.00 per year from 2013 to 2016.  This calculation, however, does not include HISD's North Forest properties.  HISD North Forest properties experienced the same overbilling from Southwest Wholesale, which amounts to approximately $15,000.00 per month, or $120,000.00 for eight months per year from 2013 to 2016.  In 2017, after a discussion between Peral Adams who was an HISD Accountant, Facilities Services, Busby, and Tracey Alexander who was the Executive Administrator of Southwest Wholesale, the total mowing acreage for Southwest Wholesale was increased from 1552 to 1751, a 199-acre increase, for the addition of two unspecified properties.  Further, on 01/15/2016 the mowing price was increased from $30.25 to

19

$35.80 per acre.  The FBI estimates that from 2013 to 2019, Southwest Wholesale has enriched itself with approximately $5,320,000.00 of systematic overbilling of HISD.

**F.      Evidence of the Crimes Under Investigation Is Located at the Premises to Be Searched**

42.     Through my work at IRS-CI and as a CPA, I have gained extensive experience investigating business or governmental entities and individuals who work for such organizations. I am familiar with normal and typical business practices with respect to computer and email use, document creation, and document retention.  In my experience, typical businesses or agencies of any significant size use computers for correspondence and document production.  The computers are normally maintained at the business offices, and hard copies of documents and emails are often printed from the computers and retained at the business offices.  In addition, as described in more detail below, although files may be "deleted" from a computer by the user, the data is not actually removed until it is over-written with another file.  Therefore, "deleted files" may often be retrieved from the computer hard drive.

**G.      Probable Cause Exists to Believe That Evidence of the Crimes under Investigation Exists at 9811 Martha Springs Houston, Texas 77070**

43.     Your Affiant has gathered the following evidence that Brian Busby resides at 9811 Martha Springs Houston, Texas 77070.  Brian Busby purchased the home in approximately June 2014.  Busby indicates that he resides at 9811 Martha Springs on his federal income tax returns.  On May 21, 2019 and February 11, 2019 Busby was observed by the FBI driving from HISD to his residence at 9811 Martha Springs.  On May 16, 2019, January 25, 2019, and March 28, 2019, Busby was observed driving from his residence at 9811 Martha Springs to HISD.

44.     On 09/25/2019, the Court approved a search warrant for the email accounts

hutchison@swat4241.com, bbusby7729@gmail.com, chicago.buffalo32@gmail.com, and

admin@swat4241.com.  Emails that were obtained from the search of Hutchison's and Busby's

email accounts demonstrate probable cause to believe evidence of the crimes described above is

located at Busby's residence at 9811 Martha Springs Houston, Texas 77070.

45.     Deborah Hutchison was previously married to Anthony Hutchison.  Deborah

Hutchison worked at Southwest Wholesale prior to her divorce from Anthony Hutchison.  On

September 10, 2015 Deborah Hutchison emailed Brian Busby at bbusby7729@gmail.com from

dah54264@gmail.com.  In this email, Deborah is expressing her displeasure with Busby for

allegedly discussing Anthony Hutchison's indiscretions during her marriage.  She chides Busby

for his behavior, and she appears to suggest that she could expose the kickback scheme if he

were to continue to talk about her marriage behind her back.  Specifically, the email states:

"Over these past years our families have been in the company of one another and not only have

we enjoyed your friendship but have **had the opportunity to along with our business help

your family.**"  (Emphasis added).  Deborah Hutchison goes on to say, "Because **you and

Anthony have a business relationship and friendship that has gone beyond honorable**

please do not put me in a position to discuss it with others as you have done with this situation."

(Emphasis added).  Later in the conversation, she adds that Busby, likewise, should also not

cover up for Hutchison by lying on his behalf "when you need him to help you."

46.     Busby and Deborah Hutchison exchanged several emails.  The emails from Busby

were sent from IP address 70.140.100.177.  IP address 70.140.100.177 is a static IP address that

AT&T assigned to Busby's residence at 9811 Martha Springs Houston, Texas 77070 during

21

2018 and 2019. Evidence of this email communication likely exists on Busby's computer at 9811 Martha Springs.

47.     AT&T U-Verse is a home internet service. According to records in the government's possession, AT&T U-Verse customers have a unique IP address directly provisioned to their account. From August 31, 2018 through August 9, 2019, AT&T U-Verse has assigned IP address 70.140.100.177 to account ending 0333. Brian Busby established AT&T U-Verse account ending 0333 for service at 9811 Martha Springs Drive, Houston, Texas 77070. Based on my knowledge and experience with investigations involving computer systems, I know that internet service providers frequently maintain static IP addresses at one location for years. Therefore, there is probable cause to believe that the emails from Brian Busby to Deborah Hutchison from IP address 70.140.100.177 were sent from 9811 Martha Springs Drive, Houston, Texas 77070.

48.     As detailed above, the government has discovered through its investigation that Southwest Wholesale submits invoices to HISD for work that was not performed. Dambrino provided a detailed account of the work she observed that was billed but not performed. In addition to the information provided by Dambrino, Your Affiant determined that on April 12, 2018 an email was sent from hutchison@swat4241.com to bbusby7729@gmail.com, stating:

> "Attached, please find the Sports Field Renovations proposal for Sharpstown Middle School..."

The email includes the same proposal for work that is referenced at paragraph 11 above. Busby was involved in approving that proposal by Southwest Wholesale, Hutchison's company.

49.     As described above, during 2018 and 2019, the government has identified

$319,735 in currency that was deposited into Navy Federal Credit Union account ending 4592

held in the name of Brian Busby.  Records in the government's possession indicate the address

on file for Navy Federal Credit Union account ending 4592 is Brian Busby's residence at 9811

Martha Springs, Houston, Texas 77070.  Your affiant has learned that Navy Federal Credit

Union has mailed statements for account ending 4592 titled to Brian Busby to 9811 Martha

Springs, Houston, Texas 77070.

50.     Brian Busby submitted documents to Navy Federal Credit Union indicating that

BCMRV Investments LLC was established to account for $15,000.00 in cash deposits.  Busby

provided the address 9811 Martha Springs, Houston, Texas 77070 to Navy Federal Credit Union

as the address where BCMRV Investments LLC operates.  BCMRV Investments LLC has

received multiple correspondences through the postal system to 9811 Martha Springs, Houston,

Texas 77070.

51.     Theodoesha Rivers (Theo) is a former IRS Revenue Agent and an Enrolled

Agent.  Theo has prepared several financial documents for Busby.  The government has obtained

an Operating Agreement for BCMRV Investments LLC.  Busby purchased and titled rental

properties to BCMRV Investments LLC.  On May 22, 2019 Theo emailed the Operating

Agreement to Busby.  The document was sent from Theo at t.rivers@eqstax.com to

bbusby7729@gmail.com.  The Operating Agreement indicates that the principal business

address of BCMRV Investments, LLC is 9811 Martha Springs, Houston, Texas 77070.  The

Operating Agreement also states that the registered agent for service of process is Brian Busby,

and the agent's registered office is 9811 Martha Springs, Houston, Texas 77070.

23

52.     The searched emails show that Busby received financial benefits from Hutchison. Email records from the search of hutchison@swat4241.com reveal that from November 2014 to January 2015, Hutchison, doing business as AL&H Customs Homes, provided extensive renovation and decoration to Busby's residence at 9811 Martha Springs Drive, Houston, Texas. Analysis of the records show that AL&H Custom Homes invoiced Southwest Wholesale to pay for the third-party invoices and decorative supplies that were used in Busby's home.  The records indicate Hutchison/Southwest Wholesale paid approximately $83,000.00 for the benefit of Busby.  Records in the government's possession show that on 03/11/2019 Busby made one unspecified payment of $44,000.00 to AL&H Customs Homes.  The government possesses no other records that show Busby made any payments to Hutchison or Southwest Wholesale for this work.

53.     In summary, there is substantial evidence to conclude that there are both electronic and paper records at Busby's residence at 9811 Martha Springs that constitute evidence of the crime.  There is also physical evidence of the benefits he received from Hutchison, in the form of remodeling.  Therefore, there is probable cause to believe evidence of the crimes under investigation is located at 9811 Martha Springs.

**H.      Probable Cause Exists to Believe That Evidence of the Crimes under Investigation Exists at Hattie Mae White Educational Support Facility, 4400 West 18th Street, Room 3SE32, Houston, Texas 77092**

54.     On 08/30/2018, Dambrino met with Busby at his HISD office, located at 4400 West 18th Street, Room 3SE32, Houston, Texas 77092, southeast corner on the third floor in the Superintendent's Suite, to discuss the issue of Southwest Wholesale not performing contracted work as stated in paragraphs 11 to 15.  Prior to the meeting, Dambrino emailed and telephoned

Busby at this office number to arrange the meeting.  Dambrino recorded the conversation.  While conversing with Busby at his office, Dambrino observed a desktop computer and binders behind his desk that contained records.  There was a calendar on Busby's desk to track his appointments and activities, which is believed to mirror the calendar kept by his secretary outside of his office. Dambrino believes Busby keeps records, both hardcopy and softcopy, at this office.  Dambrino has met with Busby at his office on two prior occasions in 2017.

55.     On 09/25/2019, the Court approved search warrant for email accounts hutchison@swat4241.com, admin@swat4241.com, bbusby7729@gmail.com, and chicago.buffalo32@gmail.com, produced approximately 3,923 emails that corresponded with bbusby@houstonISD.org, Busby's HISD email.  The emails consist of complaints from principals of HISD schools about tall grass on their respective school grounds and Southwest Wholesale not properly servicing school lawns.  The emails also discuss contracts that HISD entered with Southwest Wholesale, and some of those emails have attached documents relating to these contracts, such as invoices, purchase orders, etc.  These emailed conversations and documents are evidence of Southwest Wholesale's fraudulent billing scheme in which it systematically bills for work it has not performed.  Probable cause therefore exists to believe that evidence of the crimes under investigation, including documents, calendars, emails, and other electronic or paper records, are stored in Busby's office or on the computer in Busby's office.

## COMPUTERS AND ELECTRONIC STORAGE

56.     As described above and in the Items to Be Seized section of this affidavit (incorporated herewith), this application seeks permission to search and seize certain records that might be found on the PREMISES, in whatever form they are found. I submit that if a computer

or other electronic devices, such as cell phones or tablet devices are found on the PREMISES, there is probable cause to believe the sought records will be stored in that computer or electronic medium, for at least the following reasons:

57.     Based on my knowledge, training, and experience and information related to me by agents involved in the forensic examination of computers, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using readily available forensics tools. This is so because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  The same is true for electronic devices such as certain cellular telephones and tablet devices; files or remnants of such files can be recovered months or years later, even if deleted.

58.     Consequently, deleted files, or remnants of deleted files, may reside in free space or slack space--that is, in space on the hard drive that is not currently being used by an active file--for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

59.     Similarly, files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

60.     Portable electronic devices, such as certain cell phones and tablet computers have evolved to the point that they are in essence miniaturized "computers" unto themselves; capable

26

of performing many of the same functions – and in some cases altogether unique and different functions – as a traditional desktop computer.  These devices allow users to conduct transactions, interact with their surroundings, and communicate with people irrespective of location, and combined with the diversity of applications and their multi-functional utility (business, financial, social, commerce, communication, education, organization, personal, and other uses/applications), they are often inseparable from the user.  These devices can and do store the same types of records that are stored on desktop and laptop computers.  As a result, these portable devices often follow the user on a full-time basis and provide him/her with a readily available means to carry out a variety of tasks.  These portable devices (and installed applications) are often integrated with and capable of accessing the data and files contained on a user's home and/or work computer systems.  Updates that occur on one device can be accessible and available from any of the devices (computer, laptop, cell phone, and/or tablet device, etc.) connected to this network.  Because of the aforementioned, if portable electronic devices such as certain cell phones or tablet computers with some or all of these non-telephonic functions or capabilities are found on the PREMISES, there is probable cause to believe they were or may have been used as a means to commit the offenses described in this affidavit, or may store or contain information relating to said offenses, and their search and/or seizure is authorized.

61.     I know that when an individual uses a computer to conduct the crimes alleged, the computer the individual used will generally serve both as an instrumentality for committing the crime, and also as a storage device for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage device for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of

27

how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense. Portable electronic devices such as certain cellular phones and tablet computers are now capable of filing electronic tax returns with and to the Internal

62.     Based upon my knowledge, training and experience, I know that searching for information stored in computers often requires agents to seize most or all electronic storage devices to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is often necessary to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine those storage devices in a laboratory setting, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the laboratory setting. This is true because of the following:

63.     The volume of evidence. Computer storage devices can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

64.     Technical requirements. Searching computer systems for criminal evidence sometimes requires highly technical processes requiring expert skill and properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before

a search which expert is qualified to analyze the system and its data. In any event, however, data search processes are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (either from external sources and/or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

65.     In light of these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals), including cell phones and tablet computers that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

66.     I recognize that seizure of Busby's computers and electronic devices may have the unintended effect of limiting his ability to conduct legitimate business. In response to these concerns, the agents who execute the search anticipate taking an incremental approach to minimize the inconvenience to Busby.  I anticipate that, barring unexpected circumstances, this incremental approach will proceed as follows:

67.     Upon arriving at the PREMISES, the agents will attempt to identify the computer systems at the PREMISES.  The agents will attempt to locate the things described in the warrant, and will attempt to make electronic copies of those things. This analysis will focus on things that may contain the evidence and information of the violations under investigation. In doing this, the agents might be able to copy only those things that are evidence of the offenses described herein, and provide only those things to the case agent. Circumstances might also require the agents to

attempt to create an electronic "image" of those parts of the computer that are likely to store the things described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The agents or qualified computer experts will then conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date. If the agents successfully image the computers at the PREMISES, the agents will not conduct any additional search or seizure of the computers at the PREMISES.

68.     If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components to permit the agents to locate the things described in the warrant at an off-site location. The seized components will be removed from the PREMISES. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

## CONCLUSION

69.     Based on the foregoing, your affiant respectfully submits that probable cause exists to believe that Brian Busby and others are engaged in a scheme to defraud the government in violation of 18 U.S.C. § 666 (Theft of Federal Funds), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1346 (Honest Services Fraud), and 18 U.S.C. § 1349 (Conspiracy). Your affiant further respectfully submits that there is probable cause to believe that evidence of these crimes is currently located at 9811 Martha Springs, Houston, Texas 77070 and 4400 West 18th Street, 3SE32, Houston, Texas 77092.

30

## REQUEST FOR SEALING

70.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jason Webb
Special Agent
IRS – Criminal Investigation

Subscribed and sworn to before me on _____Feb  25_____, 2020

_____
UNITED STATES MAGISTRATE JUDGE

31

## ATTACHMENT A

## LOCATIONS TO BE SEARCHED

The locations to be searched are 9811 Martha Springs Drive, Houston, Texas 77070 and Brian

Busby's HISD Office located at Hattie Mae White Educational Support Facility at 4400 West

18th Street, Room 3SE32, Houston, Texas 77092 further described below (collectively, the

search "Locations"):

Location 1:     Brian Busby's Residence

9811 Martha Springs Drive, Houston, Texas 77070 is a single family residence.  It is located on

the south side of Martha Springs Drive.  It is in the gated community of Vintage Lakes.  The

residence is described as a two story, tan stucco building.  It has a one car bay facing north and

two car garage facing east.  On the east side of the structure are the numbers "9811."

Location 2:     Brian Busby's office at Hattie Mae White Educational Support Facility

The Hattie Mae White Educational Support Facility is located at 4400 West 18th Street,

Houston, Texas 77092 and is a multi-story office building.  The search will be limited to Brian

Busby's office identified as room 3SE32.  Busby's office is located on at the Southeast corner of

the third floor of the building.

**ATTACHMENT B**

**ITEMS TO BE SEIZED AT**

**Items to be seized at the Locations are:**

A. BUSINESS RECORDS to include all records, documents, and materials as defined below relating to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes,  9811 Martha Springs Drive, Houston Independent School District (HISD) and/or any related entities, such as invoices, purchase orders, contracts, agreements, work proposals, sub-contractor work records or proposals, payments, delivery, billing of work, and method of payment (cash, check, and etc.).

B. CORRESPONDENCE relating to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes, and/or any related entities, such as notes and correspondence whether electronic or written with any persons/entities and/or with Brian G. Busby, 9811 Martha Springs Drive, Houston Independent School District (HISD), and/or any related entities. This encompasses all contact lists, memoranda, calls, notes, files, messages, and records relating to meetings, conversations, and discussions whether live, telephonically or in electronic formats, concerning the obtaining and disposition of funds, payments, contracts, contract vendors, and contract bidding process.

C. FINANCIAL ACCOUNT RECORDS to include all records, documents, and materials as defined below relating to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes, 9811 Martha Springs Drive, HISD and/or any related entities:

   i. Bank and Financial Account Records such as savings, checking, certificate of deposit, money market, credit (loan) and similar types of accounts and the records related to such accounts such as account statements provided by the respective financial institutions and print-outs of account transactions and statements, deposit items, deposit tickets, checks, withdrawal items, offsets, wire transfers, records disclosing the dates, types, amounts and description of account transactions, notes and correspondence.

   ii. Safe Deposit Box Records such as contracts, access records, records of rental fees paid disclosing the date, amount and method of payment (cash, check, etc.).

   iii. Credit Card Records such as applications, correspondence, periodic billing statements, individual charge invoices, repayment records disclosing the dates, amounts and method (cash, check, etc.) of repayment, checks use to make repayments, notes and correspondence.

    iv.    U.S. Treasury Checks, Notes and Bills such as any government issued financial instrument.

    v.    Other records such as records of certified checks, money service businesses (MSB) transaction records, wire transfers, letter of credit, bonds, notes and correspondence.

D.  TAX RETURNS relating to to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes, and/or any related entities to include federal, state, and local tax and information returns and associated forms and schedules such as Forms 990, 1040, W-2, 1099-Misc and other similar forms, records supporting or used in the preparation of the tax returns, and notes and correspondence discussing the tax returns and/or the preparation or sue of the tax returns.

E.  PAYROLL & PAYMENT RECORDS relating to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes,, and/or any related entities, such as records identifying present and former employees and independent contractors, sub-contractors, the rates of pay, base used to determine compensation, and amounts of wages, documents provided to employees concerning payroll (pay stubs, Forms W-2 and 1099, etc.), payroll reports, payroll tax returns and records supporting those returns, and notes and correspondence concerning payroll and its computation.

F.  PERSONNEL RECORDS to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes, and/or any related entities, such as records identifying all employees (present and former), employment applications, resumes, employment contracts and arrangements, other records that document the duties, responsibilities and compensation of all employees and/or independent contractors and notes and correspondence discussing such information.

G.  PURCHASE, SALES AND OTHER FRUITS OF THE CONDUCT related to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes,, and/or any related entities, such as records of the purchase, acquisition, exchange or disposition of any assets or thing of value, such record including receipts, contracts, agreements, invoices, and other records that describe the item or transaction, date of the transaction, amounts paid or received, terms of transaction, method of correspondence discussing such transactions.

H.  SOFTWARE RECORDS such as records, documents, programs, applications or materials which could be used to create fraudulent documents and/or alter, modify or make changes to documents and other records.

2

I.  DOMAIN AND EMAIL RECORDS related to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes,, and/or any related entities, such as records of domain registered, maintained, administered or owned, including email accounts associated with those domains and information, notes and correspondence identifying the users of those email accounts.

J.  DEVICE RECORDS to include any and all records, documents, programs, applications or material containing identifiers for software, data, devices or use sessions, such as Internet Protocol (IP) addresses.  Media Access Control (MAC) addresses, Electronic Serial Numbers, Mobile Station IDs, and International Mobile Subscriber Identity numbers.

K.  CALL LOGS/RECORDS relating to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes, and/or any related entities, such as records, documents, programs, applications or materials sufficient to show call log information, including without limitation all telephone numbers dialed from any cellular telephone, or from any software, application, or digital device, as well as all received or missed incoming calls.

L.  RECORDS OF MESSAGES to Brian G. Busby, Courtney Busby, Reagan Nicole Busby, Morgan Brianne Busby, BCMRV Investments LLC, Anthony Hutchison, Southwest Wholesale LLC, Southwest Wholesale Nursery, Just Construction Inc., AL&H Customs Homes, and/or any related entities, such as records, documents, programs, applications or materials sufficient to show SMS text, MMS messages, email or any other text, photo or video communication sent to or received from any digital device.

M.  DEVICES including any computers, telephones, cellular phones, or electronic devices (including electronic address books, such as devices commonly referred to smartphones, iPhones and Blackberry), that were or may have been used as means to commit offenses described in the warrant, or that were or may have been used to store or contain evidence of said offenses, such as account information and contact information regarding the location or secretion of assets or digital/encrypted currencies and the identity and contact information of coconspirators and victims.

N.  For any computer, storage device, or other electronic media (hereinafter, "MEDIA" and inclusive of cellular telephones, smart phones, tablets, laptops, PC notebooks, and tablet computers) that is called for by this warrant, or that might contain things otherwise called for by this warrant:

i.  Records, documents, or materials of user attribution showing who used or owned the MEDIA at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

3

     ii.    Password, encryption keys, and other devices that may be necessary to access the MEDIA or data;

     iii.    Documentation and manuals that may be necessary to access the MEDIA

O.  As used above, the term "records", "documents", and "materials" includes items in whatever form and by whatever means, the records, documents, or materials, and their drafts, or their modifications may have been created or stored.

P.  In search for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedures:

     i.    The computer equipment, handheld devices, and storage devices will be seize and transported to an appropriate law enforcement facility for review.  The computer equipment, handheld devices, and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

     ii.    In searching the data, the computer personnel may examine all of the data contained in the computer equipment, handheld devices, and storage devices to view their precise contents and determine whether the data falls within the items to be seize as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized a set forth herein.

     iii.    If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time not to exceed 60 days from the date of the seizure unless further authorization is obtained from the Court.

Q.  In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize the following items, subject to the procedure set forth:

     i.    Any computer equipment, handheld device, and storage devices capable of being used to commit, further or store evidence of the offense listed above;

     ii.    Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, routers, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

     iii.    Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard drives, tapes, CD-ROMS, CD-Rs, CD-RWs, DVDs-RW, Blue Rays, flash/thumb drives, memory sticks, SD cards, optical disks, printer or

memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

iv.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, handheld devices, storage devices or software;

v.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data; and

vi.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, handheld devices, storage devices or data.